IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AUBREE CHEYENNE CORREA, | ) | Case No. 1:23-cv-685 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Aubrey Correa, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in determining Correa's residual functional capacity and when discounting her subjective symptom complaints, I recommend that the Commissioner's final decision denying Correa's application for DIB be vacated and that Correa's case be remanded for further consideration.

## II.      Procedural History

On February 11, 2021, Correa filed an application for DIB.  (Tr. 15, 62, 159).  Correa initially alleged a disability onset date of June 12, 2018, (Tr. 15, 159), and asserted that she was disabled due to epilepsy, syncope (fainting), anxiety, and depression, (Tr. 62, 214).  Correa subsequently amended her alleged onset date to February 11, 2021.  (Tr. 37).  The Social

Security Administration denied Correa's application at the initial level, (Tr. 62-70), and then

upon reconsideration, (Tr. 71-78).  Correa requested a hearing.  (Tr. 96-97).

Administrative Law Judge ("ALJ") Noceeba Southern heard the matter on March 15,

2022 and denied the claims in an April 8, 2022 decision.  (Tr. 15-27).  In so ruling, the ALJ

determined that Correa had the residual functional capacity ("RFC") to perform work at the light

exertional level, except that:

> [Correa] should avoid workplace hazards and commercial driving. The claimant should not climb ladders, ropes, or scaffolds. She can tolerate occasional changes in static work environment, with few detailed instructions. Where there are changes, the claimant should have supervisory support during changeovers. She would benefit from 1 to 2 reminder[s] to get back on task and refocus. She is permitted to be off task up to 8% of the workday.

(Tr. 20).  On January 31, 2023, the Appeals Council denied Correa's request for review, making

the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  On April 1, 2023, Correa

filed a complaint to obtain judicial review.  ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Correa was born on July 28, 1997 and was 23 years and 6 months old on the alleged

onset date.  *See* (Tr. 37, 159, 210).  Correa completed her high school education, (Tr. 215), and

had past work as a nanny, cleaner, and factory worker.  (Tr. 68-69, 200, 215).

### B.    Subjective Symptom Statements in Disability and Function Reports

In her March 31, 2021 disability report, Correa remarked that: (i) her epilepsy made

finding a job impossible; (ii) having a seizure affected her ability to drive for a minimum of six

months after each event; and (iii) normal work stress was one of the triggers that made a seizure

more likely.  (Tr. 220-221).  On June 21, 2021, Correa stated the following about her medical

condition and its effects on her activities and life in her disability appeal report:

2

On June 4th, 2021, I had surgery to have my tonsils removed due to chronic tonsillitis. The surgery itself went great, but immediately after I was put into the recovery room, I had upwards of 25 tonic-clonic seizures back to back that lasted 10-30 seconds each.  I was then transferred to Riverside Methodist Hospital in Columbus where I again had an additional 5 seizures in the emergency room. Since these seizures, my medication dosage had been raised and another anti-convulsant has been added.  Due to the seizures my driving privileges have been suspended and I am no longer allowed to do anything alone, (bathe, cook, swim, etc.) operate any equipment, or do anything dangerous as to if I lose consciousness it could be harmful.  I also have had consistent short term memory loss to where I cannot remember if I have taken my said medication or not unless someone watched me do it, or I am consistently repeating myself due to not remembering saying something.

* * *

Since the seizures that I had, I can no longer work. I am no longer employed.  I cannot drive, simply be left alone, or operate any machinery or vehicles.  I constantly have to be monitored by close family to make sure that I do daily personal hygiene activities, take my medication as prescribed, and eat.  The side effects of my new medication mixed with the added dosage of my current anti-seizure medication has caused extreme short term memory loss and also extreme fatigue.  I find it extremely hard to go 4 hours during the day without having to lay down to try and rest because a trigger for my seizures is lack of sleep or exhaustion and stress. Since the medications make me so exhausted I have to watch to make sure I don't over do it with simple daily activities to prevent myself from having another seizure.

* * *

After the multiple seizures that I had, I suffer from extreme short term memory loss. I can no longer remember when or if I have taken my anti-seizure medications, so I need to be asked or reminded each day, twice daily to take them.  I also have to be reminded to simply take a shower, brush my teeth, eat, etc. I can no longer drive, operate any vehicles or machinery, work with hazardous materials or tools, bathe alone, watch my child alone, cook, or even be left alone for that matter. I constantly have to be monitored to ensure that if I do have a seizure, I am safe and don't choke on my vomit if I vomit, or lose my airway.  My life has taken a complete 360 degree turn.

(Tr. 233, 238, 240).  On June 21, 2021, in a second disability appeal report, Correa stated that she was "struggling to remember to take my medications, what I'm doing, when I showered last, what day, month, or year it is.  The memory loss has gotten worse."  (Tr. 245).

3

### C.    Medical Evidence

On April 9, 2019, Correa had an appointment with Robert Woodruff, M.D., for management of her epilepsy, with Correa reporting that she had two back-to-back seizures around Christmas 2018.  (Tr. 312).  Correa's review of systems and examinations were unremarkable.  (Tr. 313-314).  Dr. Woodruff continued Correa on Keppra (anticonvulsant) and folic acid medications.  (Tr. 314).  In November 2019 and May 2020, Correa had follow-up appointments with Dr. Woodruff concerning the management of her epilepsy.  (Tr. 307, 312).  At both appointments: (i) Correa's review of systems and examinations were unremarkable; (ii) Dr. Woodruff observed that she was stable and doing well; and (iii) she was continued on her course of medication.  (Tr. 307-314).

On April 6, 2021, Correa had an appointment with Melany F. Raedy, D.O., regarding her seizures and epilepsy.  (Tr. 348).  Dr. Raedy remarked that Correa had "done well on Keppra 750 mg bid and seizure-free ×3 years.  She recently delivered a healthy baby girl who is not sleeping and she is concerned because lack of sleep is one of her seizure triggers."  (Tr. 348).  Correa's physical examination was unremarkable, and she was continued on her medication with an increase of Keppra during this continued episode of sleep deprivation.  (Tr. 350).

On June 4, 2021, Correa was diagnosed with chronic tonsillitis and tonsil stones and underwent a lingual tonsillectomy with laser.  (Tr. 407-411).  Post operation, Correa suffered "many short seizures" and was transferred to Riverside Methodist Hospital's ("Riverside") neurology service by ambulance.  (Tr. 417).  Correa was admitted to the stroke unit at Riverside where Dr. Fulp was subsequently called into Correa's room after she reported a 22nd seizure.  (Tr. 354).  Correa's physical examination revealed that her mental status was lethargic and confused, but her sensation, motor function, and coordination were all intact.  (Tr. 356-357).  Dr. Fulp noted that Correa had suffered from 20 post-operation seizures and another 4 to 5 more in

4

the Riverside emergency room.  (Tr. 361-362).  On June 5, 2021, a long-term monitoring EEG study was completed which displayed normal results and revealed no abnormalities.  (Tr. 370). Correa was advised to continue taking Keppra at 1125 mg and Vimpat at 100 mg, both twice a day, and was advised on discharge to avoid driving and dangerous behaviors (such as swimming and bathing alone).  (Tr. 371-73).

On June 18, 2021, Correa had an office appointment with Dr. Raedy during which she reported having suffered two seizures four days earlier when attempting to discontinue the use of Vimpat, due to the cost of the medication.  (Tr. 403, 426).  Correa's review of systems revealed she had depression because of concerns for the cost of her medication and her desire to be pregnant in the future.  (Tr. 403, 426).  Dr. Raedy advised Correa to continue taking her medication as prescribed.  (Tr. 406, 429).

On June 21, 2021, Correa had an appointment at Avita Ontario Family Medicine during which she complained of gland swelling post-tonsillectomy.  (Tr. 449).  Correa's review of systems was positive for a right axilla lump but otherwise negative in all other respects, including dizziness, tremors, syncope, weakness, light-headedness, numbness, headaches, and psychiatric/behavioral issues.  (Tr. 450).  Her neurological exam revealed that she was alert and oriented to person, place, and time.  (Tr. 451).

On July 13, 2021, Correa had a consultation with a neurologist, Angela Parsons, D.O., concerning her epilepsy and memory loss.  (Tr. 686).  Correa provided her medical history and reported worsening memory over the previous month and a half since her hospitalization for post-operation seizures – with trouble remembering the correct date or to take medication. (Tr. 688-689).  Correa's review of systems and physical examination were unremarkable – with normal motor, sensation, coordination, and gait.  (Tr. 692).  Dr. Parsons increased Correa's Keppra dosage, prescribed Imitrex for post-seizure headaches, and recommended transitioning

5

off Vimpat and back onto Lamictal.  (Tr. 693).  Dr. Parsons stated that it was unclear whether her
memory issues were being caused by Vimpat or a high seizure burden.  (Tr. 692-693).

On September 3, 2021, Correa had a follow-up consultation with Dr. Raedy.  (Tr. 668).
She reported feeling "off" and having memory concerns.  (Tr. 668).  Dr. Raedy diagnosed Correa
with epilepsy and memory impairment and advised her to continue taking her anticonvulsant
medication (Keppra and Lamictal), noting that she could drive in four months with someone in
the front seat and drive alone in six months.  (Tr. 671).

On November 14, 2021, Correa was brought by EMS to the Mansfield Hospital
Emergency Department and admitted after suffering from unknown convulsions and seizure
activity ("jerking of upper extremity with rolling of the eyes").  (Tr. 465-470, 474).  On
examination, it was noted that Correa displayed seizure activity, but she also displayed a normal
range of motion, was alert, and displayed no focal deficit.  (Tr. 472).  Correa was treated and it
was later noted that she appeared more alert but confused.  (Tr. 474).  Correa was offered to stay
for more in-patient observation, but she preferred to be discharged and she was encouraged to
not drive until evaluated and released by neurology.  (Tr. 474).

On November 16, 2021, Correa had a follow-up appointment with Dr. Parsons via
"video/audio/telecommunication technology."  (Tr. 673-679).  Correa reported experiencing
significant memory impairment since her hospitalization on November 14, 2021.  (Tr. 675).  Dr.
Parsons increased the dosage of Lamictal, prescribed "rescue" Valtoco, and stated that she felt it
was time to admit Correa to the epilepsy monitoring unit.  (Tr. 677).  Dr. Parsons noted his
suspicion that her memory loss was related to her seizures and that it may take several days for
her to return to a normal baseline.  (Tr. 677).

On December 22, 2021, Correa was admitted to the Epilepsy Monitoring Unit ("EMU")
at Riverside.  (Tr. 515-518).  Correa reported that she had been doing well until she experienced

6

a "recurrent cluster" of seizures in November 2021, when her husband found her face down and unresponsive in their home.  (Tr. 518).  She further reported that she: (i) may develop tinnitus, lose her sight, experience palpitations, and experience dry mouth during an episode; (ii) experienced generalized stiffness and convulsive activity; (iii) took Lamictal and Keppra without any side effects; and (iv) was not experiencing stressors and was in a good mood. (Tr. 519).  She also reported that she was having short-term memory issues that had worsened since her recent episodes of prolonged seizures.  (Tr. 519).  Her review of systems was unremarkable.  (Tr. 520).  A neurological examination revealed that Correa was in no distress, was alert and cooperative, and her mental status, cranial nerves, motor functioning, sensation, coordination, and gait were all normal and intact.  (Tr. 521-522).  Correa underwent video EEG monitoring with active provocation of seizures via standard techniques, including withdrawal of her anticonvulsant medication and forced sleep deprivation.  (Tr. 523).

During monitoring from December 22 to 24, 2021, no electrographic seizures or clinical target spells were captured despite active provocation.  (Tr. 526).  On December 24, 2021, there was a clinical manifestation of bilateral hand shaking, which was deemed a non-epileptic event. (Tr. 527, 545).  From December 25 to 27, 2021, no events were captured.  (Tr. 527-530).  On December 27, 2021, Correa was discharged from the EMU, prescribed anticonvulsant medication, and instructed to follow up with her primary neurologist and primary care provider. (Tr. 545-546).

### D.    Opinion Evidence

#### 1.    State Agency Medical Consultants

State agency reviewing medical consultant Lynne Torello, M.D., completed an assessment of Correa's physical residual functional capacity ("PRFC").  (Tr. 67-68).  Dr. Torello found that Correa had: (i) no manipulative, visual, or communicative limitations; (ii) postural

limitations limited to her never climbing ladders/ropes/scaffolds; and (iii) environmental limitations limited to her avoiding exposure to all hazards.  (Tr. 67).  Dr. Torello opined that "[d]ue to history of seizure disorder, [Correa] would be limited from working at heights, operating heavy machinery, and commercial driving."  (Tr. 67).  At the reconsideration level, Elizabeth Das, M.D., reviewed and affirmed Dr. Torello's findings as to Correa's PRFC. (Tr. 75-76).  At both the initial and reconsideration stage, the state agency reviewing consultants found that Correa suffered from one severe medically determinable impairment – epilepsy. (Tr. 65, 73).

### 2. State Agency Psychological Consultants

State agency reviewing psychological consultant Cynthia Waggoner, Psy.D., completed a Psychiatric Review Technique ("PRT") for Correa.  (Tr. 65-66).  Dr. Waggoner opined that Correa had: (i) only mild limitations in her ability to interact with others; (ii) only mild limitations in her ability to concentrate, persist, or maintain pace; and (iii) no severe mental impairment.  (Tr. 65-66).  At reconsideration, Deryck Richardson, Ph.D., reviewed and affirmed Dr. Waggoner's findings as to the PRT.  (Tr. 73-74).

### E. Testimonial Evidence

### 1. Claimant Aubree Correa

Correa testified at the ALJ hearing.  (Tr. 36-55, 59-60).  In relevant part, Correa testified that her tonic-clonic seizures would happen sporadically and in clusters, with her having suffered 30 seizures in June 2021, 1 in July 2021, 13 in November 2021, and 1 in February 2022.  (Tr. 43-45).  She testified that she took her medication regularly, but she needed her parents or husband to dispense her medications in the morning and evening because of her memory loss.  (Tr. 46). Correa and her attorney had the following exchange about whether she had suffered physical injuries from her seizures:

> [Attorney] Have you had any damage to your body from a seizure? You know, sometimes people bang their head or bite their tongue, pee their pants, stuff like that?
> [Correa] I've definitely hit my head a couple times, black eyes.  And then since the seizures of last year, especially the June ones, I have suffered pretty severe short and long term memory loss.

(Tr. 49).

As for her memory loss, she testified that it was quite severe, she had trouble remembering her family members and life events, and it required her to be supervised by her family at all times.  (Tr. 49-50).  She further testified that she was not allowed to do any of the following without supervision: bake, use the stovetop, bathe herself, bathe her daughter, or go outside.  (Tr. 50-51).

The ALJ asked Correa if she was still able to do chores and daily activities around her house, and she responded that she could, but she noted that she would often forget things and she needed to be reminded to do things or be at specific places.  (Tr. 54-55).  In response to further questioning from the ALJ, Correa testified that: (i) she had a seizure in February 2022 that did not require her to visit the hospital; (ii) she had not visited the hospital for any reason in 2022; (iii) the doctor had not changed her medication, but it might need alteration after a blood draw at the end of the week; and (iv) she did not think her medication was helpful at its current level. (Tr. 59-60).

## 2. Vocational Expert

Shawna McCullah, a Vocational Expert ("VE"), also testified.  (Tr. 55-59).  After reviewing Correa's file and listening to her testimony, the VE classified Correa's past work as follows: "[Correa] worked as a spot welder.  The [Dictionary of Occupational Titles ("DOT")] number 819.685-010, with an SVP of 2.  The DOT exertion level is medium.  She performed the job at a light exertional level."  (Tr. 55-56).  The ALJ posed the first hypothetical, asking the VE

9

to assume a hypothetical individual with Correa's age, education, background, and work experience, who had the capacity to perform light work with the following limitations:

> this hypothetical individual should avoid ladders, ropes, or scaffolds. Should avoid hazards including moving machinery, heavy machinery, and unprotected heights, as well as any commercial driving. This hypothetical individual would perform best with a position where there are occasional changes in the static work environment that require few detailed instructions and where there are changes, but there is supervisory support provided during that changeover.

(Tr. 56). The ALJ then asked the VE whether such a hypothetical individual could perform Correa's past work or any other work in the national economy. (*Id.*). The VE testified that such a person could not perform Correa's past work but could perform the following jobs: (i) merchandise marker, a light exertional level, SVP 2 job; (ii) garment folder, a light exertional level, SVP 2 job; and (iii) small parts assembler, a light exertional level, SVP 2 job.[1] (Tr. 56-57).

The ALJ then posed a second hypothetical to the VE, altering the first hypothetical to add the following restrictions: (i) would benefit from one to two reminders to get back on task and refocus; and (ii) would otherwise be off task up to 8% of the day. (Tr. 57). The VE testified that the added restrictions would not be work preclusive and the jobs cited for the first hypothetical would still remain viable. (*Id.*). The ALJ posed a third hypothetical to the VE, altering the second hypothetical to add a restriction that the hypothetical individual would have an occasional risk of seizures and/or passing out as a result of seizures. (Tr. 57-58). The VE testified that the individual in the third hypothetical could not perform Correa's past work or any other work in the national economy. (*Id.*).

Correa's counsel cross-examined the VE and engaged in the following exchange:

---

[1] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000). "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." *Id.*

[Counsel] Based off your experience, I know it was hypothetical #2 we had one to two reminders with the 8% off task, if I said reminders, you know, throughout the workday, they had -- I want the reminders to include like they have to be retaught something they should have already learned within the 30-day work period.  They forgot how to do something.  So, instead of saying -- just, additionally, they're gonna need to be, I guess, retaught or reminded how to do the job.  Does that change anything?

[VE] And that would occur like one or two times in an eight-hour workday where they'd have to actually be instructed on how to do the job again?

[Counsel] Yeah.  Yes.

[VE] Based on my professional experience, training, and education, that would be work preclusive.

(Tr. 58-59).

## IV.    The ALJ's Decision

At Step Two, the ALJ determined that Correa had the following severe impairments: "intractable epilepsy without status epilepticus, migraine, depression, anxiety, memory impairment."  (Tr. 18).  At Step Four, the ALJ determined that Correa had the residual functional capacity ("RFC") to perform work at a light exertional level, with the limitations described at page 2 above.  (Tr. 20).

The ALJ considered Correa's subjective symptom complaints by first quoting statements in Correa's various disability reports that described how: (i) she suffered multiple-seizure episodes; (ii) these episodes had an increasingly negative effect on her life; (iii) stress was a trigger for her seizures; and (iv) her medication was causing side-effects that included significant fatigue and memory loss.  (Tr. 21-22 (citing Tr. 220-221, 233, 245)).  She then provided a summary of Correa's testimony about the nature of her symptoms, precipitating and aggravating factors, her medication and its side-effects, and other measures used to relieve her symptoms.  (Tr. 22-23).

11

The ALJ also provided the following summary of the medical evidence concerning

Correa's seizure disorder:

> With respect to her seizure disorder, her neurologist noted in May 2020 that the claimant's last known seizure was Christmas 2017, when she was ill with the virus. She was prescribed Keppra 750 mg twice a day ([Tr. 371]). Although she alleges she became disabled on February 11, 2021, she reportedly had no seizures in three years, until she was given Versed in the recovery room after a tonsillectomy on June 4, 2021, four months after her alleged onset date of disability. It is unclear what conditions the claimant believes were disabling for the first four months after the date she alleges disability. Treatment notes show that she had multiple brief seizures in the post anesthesia intensive care unit, resulting in transfer to a hospital with neurology coverage. EMS reported around 20 seizures lasting 7-20 seconds each during transport. The claimant had for five more seizures at the second hospital and was given a loading dose of the anti-seizure medication Vimpat at the recommendation of the neurologist. After receiving medication, she was slightly drowsy in the emergency room, had no more seizures, and a 17 hour EEG showed him no abnormalities, and no interictal epileptiform discharges (IED's) ([Tr. 361, 363, 370, 373]). Cranial CT showed no hemorrhage or other acute intracranial process ([Tr. 397]). The claimant was discharged on Keppra and Vimpat ([Tr. 380]). The seizures were characterized as "breakthrough seizures, rather than status epilepticus ([Tr. 379]). The claimant's tonsillectomy began 11:57 a.m. on June 4, 2021, and EEG showing no more seizure activity began at 11:15 PM the same day, leading to the conclusion that all related seizure events took place within that 12 hour window on June 4, 2021 ([Tr. 370, 414]).
>
> Two weeks later, the claimant was seen in neurology follow-up. She said she tried to go off the Vimpat because it was so expensive but had two seizures four nights before her appointment. She was advised to continue taking her medications as prescribed ([Tr. 426-429]).
>
> Neurologist Angela Parsons, DO, so the claimant in July 2021, approximately one month after her June 2021 seizures. Dr. Parsons reviewed the claimant's seizure history, recent hospitalization for tonsillectomy for multiple seizures occurred after being seizure free for three years, and to breakthrough seizures afterwards when the claimant attempted to discontinue Vimpat. She reported an aura prior to convulsive seizures, and postictal headaches. She said she been having difficulty with her memories and she was hospitalized, having difficulty remembering to take her medications. She was stressed over taking care of her infant daughter, and because her parents had to take turns staying with her during the day while her husband was at work. She had lost her independence and was not able to drive. The claimant hoped to become pregnant again and was concerned about the effect of anti-convulsion medications on a developing child. The claimant was given questionnaires about anxiety and depression, and, based on her subjective report of her symptoms, achieved scores consistent with severe anxiety and depression. She said she experienced anxiety and depression when she was younger, as well. The

claimant was alert and oriented, with adequate attention and concentration, and a normal general fund of knowledge. She denied mood swings. The claimant had clonazepam at home to abort a seizure, in case she developed a seizure [aura]. She was prescribed Imitrex as needed for seizure headaches, which the claimant described as significant. Dr. Parsons did not diagnose anxiety or depression or prescribed any treatment for these conditions. ([Tr. 686-693]).

Melanie Reedy, DO, saw the claimant in neurology follow-up in September 2021. The claimant said she was anxious about her memory. Dr. Reedy prescribed Lamictal in place of Vimpat. She described the claimant is pleasant and in no acute distress. The doctor stated that a formal mental status examination was not performed, however Dr. Reedy noted that the claimant was interactive and knew her medications and history well. The claimant's gait station were normal. Despite the absence of any supporting evidence of diminished mentation, Dr. Reedy diagnosed intractable epilepsy without status epilepticus and memory impairment. She prescribed speech therapy for the claimant's memory, but there is no evidence that the claimant ever participated in the recommended treatment. ([Tr. 668-671]).

The claimant was taken to the emergency room by EMS of November 2021, for seizure activity. She was having jerking of the upper extremity with rolling of the eyes, which was typical of her seizure. She was given Ativan and IV Keppra, after which her tremors resolved and she became alert. She was monitored for a few more hours then discharged to outpatient neurology ([Tr. 495]). She was evaluated by Dr. Parsons two days after, when she was seen at the hospital but not admitted. The claimant reports that she had significant memory impairment and was having trouble recognizing family members. She said she begin giving seizures without warning while putting up Christmas decorations. Her husband reported 13 seizures internal. She'd thrown up in the morning and it is unclear if she threw up her medications. She had not had any seizures since July 1. The claimant reported increased anxiety in the past few months because of seizures. Dr. Parsons believes that the new memory deficit was because of the recent group of seizures, and expected the claimant to take several days to return to baseline ([Tr. 675-677]).

The claimant was hospitalized for five days in the Comprehensive Epilepsy Center for continuous EEG monitoring, in December 2021, in hopes of diagnostic capture of a convulsive spell. Clinicians attempted to provoke a seizure by withdrawing medications, sleep deprivation, visual stimulation, and HCA, but no elective form abnormalities were provoked, only a single spell of hand tremor. Therefore epilepsy was not offered as a diagnosis, but was strongly suspected based on historical features described. The claimant was taking Lamictal and Keppra. She was advised to avoid dangerous behaviors unless supervision was available, including driving within three months of altered consciousness ([Tr. 545]).

(Tr. 23-24).

The ALJ concluded that the medical history appeared to demonstrate a "seizure disorder in partial control with medication compliance, though there appears to be some susceptibility to seizure activity with stress and sleep deprivation." (Tr. 24). Addressing Correa's migraines, the ALJ stated: "Although she testified at her disability hearing [to having] frequent migraine headaches, she has not submitted medical evidence of migraines other than as part of her medical history, or during the period under consideration, as independent of seizures." (Tr. 24).

The ALJ found that Correa's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 24). In support of this finding, she provided the following explanation:

> For example, the claimant testified that she frequently injured herself in falls due to convulsions, hitting her head so severely she developed black eyes, as a result of her seizures, however, the medical evidence showing regular emergency room and inpatient treatment as a result of her convulsive epilepsy does not report a single instance of any sort of head bruising, much less black eyes, which presumably would have been noticed by physicians assessing her neurological status, if they were present.

(Tr. 24-25).

The ALJ found the opinions of the state agency consultants at the initial and reconsideration level to be unpersuasive because: (i) "evidence received at the hearing level shows that the claimant is more limited than determined by the State agency consultants"; and (ii) "the State agency consultants did not adequately consider the claimant's subjective complaints or the combined effect of the claimant's impairments." (Tr. 25). The ALJ did not cite any evidence or provide further explanation for discounting the opinions. (Tr. 25).

14

**V.**     **Law & Analysis**

   **A.**     **Standard of Review**

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Correa v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Correa*, 336 F.3d at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo."(quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v.*

15

*Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, and laboratory findings. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

16

B.      **Step Four – RFC Limitations**

1.      **RFC Lacking Support and Sufficient Explanation**

Correa contends that the ALJ erred in her RFC findings because the limitations in the RFC are unsupported by substantial evidence and the ALJ did not sufficiently explain the reasoning behind adopting such limitations, which included: "(1) light work; (2) occasional changes in static work environment, with few detailed instructions; (3) supervisory support during changeovers; (4) 1 to 2 reminder[s] to get back on task and refocus; and (5) off task up to 8% of the workday."  (Tr. 8-17).  The Commissioner disagrees, arguing that the ALJ is not required to cite specific medical evidence to justify every portion of the RFC and evidence in the record supports the RFC limitations.  (Tr. 8-13).

I find that the ALJ failed to apply proper legal standards in her determination of Correa's RFC because the ALJ failed to adequately explain the basis for her findings and therefore did not satisfy her obligation to build a logical bridge between the evidence and the result. 42 U.S.C. § 405; *Rogers*, 486 F.3d at 241; *Fleischer*, 774 F. Supp. 2d at 877.  At Step Four, after providing Correa's RFC, the ALJ's decision thoroughly summarized the record evidence, including the medical evidence (doctor's visits, treatments, test results, and examinations), as well as Correa's subjective symptom complaints.  (Tr. 20-24).  The decision then discounted Correa's subject symptom complaints and found the opinions of the state agency reviewing consultants to be unpersuasive.  (Tr. 24-25).  The ALJ was required to provide "a narrative discussion describing how the evidence supports each [RFC] conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p, 1996 SSR LEXIS 5, at *19.  However, when she summarized the medical evidence, discounted the subjective symptom complaints, and discounted the state agency reviewing consultants, the ALJ

17

never discussed how she analyzed the medical evidence, nor did she provide a link or explanation between the record evidence and the limitations in the RFC.  *See* (Tr. 20-25).

When she reviewed the opinions of the state agency reviewing consultants, the ALJ found their opinions to be unpersuasive because: (i) "evidence received at the hearing level shows that the claimant is more limited than determined by the State agency consultants"; and (ii) "the State agency consultants did not adequately consider the claimant's subjective complaints or the combined effect of the claimant's impairments."  (Tr. 25).  The ALJ provided no analysis or explanation as to how this "hearing-level evidence" or Correa's subjective complaints undermined their assessments.  Moreover, the ALJ did not explain, describe, or cite what specific evidence within the record supported her conclusion or rendered the state agency consultants' assessments unpersuasive.  (Tr. 25).

The ALJ then ended the Step Four discussion by stating:

In summary, while the claimant has medically determinable impairments that could reasonably cause some symptoms and limitations, the above evidence shows that the claimant's testimony regarding the extent of such symptoms and limitations is not fully supported.  However, the claimant's complaints have not been completely dismissed, but rather, have been included in the residual functional capacity to the extent that they are consistent with the evidence as a whole.  Nevertheless, in considering the criteria enumerated in the Regulations, Rulings, and case law for evaluating the claimant's subjective complaints, the claimant's testimony was not persuasive to establish an inability to perform the range of work assessed herein.  The location, duration, frequency, and intensity of the claimant's alleged symptoms, as well as precipitating and aggravating factors are adequately addressed and accommodated in the above residual functional capacity.

As the subjective complaints in the record do not support further reduction of the established residual functional

(Tr. 25).

But the ALJ never explained how the specific elements of the RFC incorporated or accounted for any of Correa's severe impairments or limitations.  The decision simply stated that the subject symptom complaints did not warrant a more restrictive RFC, but this explanation did

18

not justify or explain the restrictions actually adopted in the RFC.  The undersigned recognizes that an ALJ's decision need not be so comprehensive as to account with meticulous specificity for each finding and limitation, nor is the ALJ required to discuss every piece of evidence in the record.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004).  That said, when evaluating a claimant's impairment, the ALJ must provide sufficient explanation for the claimant and any reviewing court to "trace the path of his reasoning" and explain how the evidence supported the limitations found in the RFC.  *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (internal quotations omitted).  An ALJ's decision must articulate with specificity the reasons for her findings and conclusions.  *See Bailey v. Comm'r of Soc. Sec.*, No. 98-3061, 1999 U.S. App. LEXIS 1621, at *12 (6th Cir. Feb, 2, 1999) (unpublished) ("Thus, an ALJ's decision must articulate with specificity reasons for the findings and conclusions that he or she makes."); *Bledsoe v. Comm'r of Soc. Sec.*, No. 1:09-cv-564, 2011 U.S. Dist. LEXIS 11925, at *12 (S.D. Ohio Feb. 8, 2011) ("[T]he ALJ's failure to articulate with specificity the reasons for her findings and conclusions 'deprives the Court of the ability to conduct any meaningful review.'"); *see also Loukinas v. Comm'r of Soc. Sec.*, No. 1:14-cv-930, 2016 U.S. Dist. LEXIS 36430, at *54 (S.D. Ohio Mar. 21, 2016) ("Where an ALJ fails to adequately explain his rationale for adopting particular limitations in an RFC, the matter must be remanded for further fact finding").

Here, the court is unable, simply by reviewing the ALJ's discussion of the evidence, to determine how that evidence translated into the ALJ's specific RFC findings, particularly how they account for Correa's memory impairment.  This lack of an explanation is particularly troubling when the ALJ discounted the opinions of the state agency consultants, which found only one severe impairment (epilepsy) and no mental limitations, (Tr. 65, 74), and did not rely on or seek any other expert opinion to determine that Correa: (i) had four additional severe

impairments (migraine, depression, anxiety, memory impairment), (Tr. 18); and (ii) had an RFC with several mental limitations (supervisory support during changeovers, would benefit from 1 to 2 reminders to get back on task and refocus, and permitted to be off task up to 8% of the workday), (Tr. 20).  We can only speculate as to what evidence the ALJ used to discount the state agency consultants' opinions and how the RFC incorporated the severe MDIs found by the ALJ – including Correa's memory impairment.  But such speculation is outside the scope of our review, as it is not the role of the court to re-weigh evidence, decide questions of credibility, or substitute the court's judgment for that of the ALJ.  *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012).  Accordingly, the ALJ failed to build the logical bridge necessary for meaningful review.  *See Fleischer*, 774 F. Supp. 2d at 877.

I further find the ALJ's error was not harmless.  First, Correa argues that the record supports stricter limitations in the RFC which are work preclusive – specifically, ongoing supervision and greater memory and focus impairments.  ECF Doc. 8 at 15-17.  The VE testified that a hypothetical person with Correa's age, education, background, work experience, and RFC would be able to perform some work in the national economy – with the VE considering the mental limitations adopted in the RFC for: (i) 1-2 reminders to get back on task and refocus; and (ii) permission to be off task up to 8% of the workday.  *See* (Tr. 56-57).  However, based on the VE's testimony during cross-examination, a restriction for daily reminders of how to perform work tasks would be work preclusive.  *See* (Tr. 58-59).  Second, the VE testified that a hypothetical person with Correa's RFC could not perform any work in the national economy if they suffered from "an occasional risk of seizures and/or passing out as a result of seizures" – which was a restriction posed by the ALJ herself.  (Tr. 57-58).  A review of the record demonstrates substantial evidence to support the conclusion that Correa is at risk for occasional seizures, and the ALJ's decision provided no discussion or analysis that would appear to

undermine or contradict this conclusion. *See* (Tr. 20-25, 354-357, 361-362, 403, 417, 465-470, 472-474, 668, 675-677, 688-689). Finally, although the Commissioner cites evidence in the record that would support the ALJ's RFC limitations, ECF Doc. 10 at 11-12, we cannot use this evidence as a substitute for the ALJ herself having provided such an analysis, because doing so would amount to an improper *post hoc* rationalization by this court, *Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007); *S.E.C. v. Chenery*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); *S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947). Thus, without the ALJ having provided a sufficient explanation as to how she determined the limitations in the RFC, the ALJ not adopting the restrictions alleged by Correa and raised during the VE's testimony cannot be considered harmless.

In sum, although it is possible the ALJ might have had a substantial evidence basis for making the RFC findings that she made, we cannot reach that conclusion based on what is in the ALJ decision. It was so conclusory at key points that tracing the ALJ's reasoning was not possible; and, at a minimum, the ALJ failed to build a logical bridge between the evidence and her results.

### 2. Discounting Subjective Symptom Statements

Correa argues that the ALJ failed to provide a sufficient explanation and rationale for discounting Correa's subjective symptom complaints because the ALJ did not provide evidence that: (i) demonstrated the symptom allegations were inconsistent with the record; or (ii) otherwise supported her conclusion that the allegations were unsupported. (Tr. 18-21). Specifically, Correa argues that the ALJ's reason for discounting her subjective complaints – a lack of evidence in the record for black eyes and head injury – was an error because: (i) the ALJ misconstrued Correa's testimony; and (ii) the lack of such evidence did not contradict Correa's

actual allegations. (Tr. 20-21). The Commissioner disagrees, arguing that the ALJ's decision demonstrated that she properly considered multiple regulatory factors before discounting Correa's allegations. (Tr. 13-15).

At Step Four, the ALJ must consider a claimant's subjective symptom complaints in determining a claimant's RFC. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability."). An ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). When evaluating a claimant's subjective symptom complaints, the ALJ may consider several factors, including:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ

properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as [she] acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). However, if an ALJ discounts or rejects a claimant's subjective complaints, she must clearly state her reasons for doing so. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship*, 874 F.2d at 1123. However, the lack of corroborating medical evidence is not itself dispositive of the severity of a claimant's impairments. SSR 12-2p, 2012 SSR LEXIS 1, at *14; SSR 16-3p, 2016 SSR LEXIS 4, at *12-13. In such cases, the ALJ must:

> consider all of the evidence in the record, including the [claimant's] daily activities, medications, or other treatments the [claimant] uses, or has used, to alleviate symptoms; the nature and frequency of the [claimant's] attempts to obtain medical treatment for symptoms; and statements by other people about the [claimant's] symptoms.

SSR 12-2p, 2012 SSR LEXIS 1, at *14; *see also* SSR 16-3p, 2016 SSR LEXIS 4, at *18-19.

I find that the ALJ failed to properly apply the legal standards in her evaluation of Correa's subjective symptom complaints.  42 U.S.C. § 1383(c)(3); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009).  After she summarized Correa's subjective symptom complaints, the ALJ concluded that they were not consistent with the record evidence.  (Tr. 25-25).  Yet the ALJ's reasoning failed to build an accurate and logical bridge between the evidence and her conclusion that Correa's subjective symptom complaints were not consistent with the evidence in the record.  *Fleischer*, 774 F. Supp.2d at 877.  The ALJ stated that Correa's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (Tr. 24).  As discussed above, the ALJ's decision provided a thorough summary of the record evidence.  However, it never provided an explanation as to how Correa's statements were inconsistent with the record; thereby, inviting the reviewing court to guess as to the exact reasoning of the ALJ.  The ALJ then cited one specific example to illustrate the supposed inconsistency, stating:

> [Correa] testified that she frequently injured herself in falls due to convulsions, hitting her head so severely she developed black eyes, as a result of her seizures, however, the medical evidence showing regular emergency room and inpatient treatment as a result of her convulsive epilepsy does not report a single instance of any sort of head bruising, much less black eyes, which presumably would have been noticed by physicians assessing her neurological status, if they were present.

(Tr. 24-25).  The ALJ had previously discussed this portion of Correa's testimony at Step Two, stating that Correa had "recently mentioned to her doctor that she was having difficulty with her memory after most recent seizure episode, and she testified that she was becoming extremely forgetful and had difficulty concentrating, which she is ascribed to hitting her head when she fell secondary to convulsions."  (Tr. 19).

But the record does not support the ALJ's characterization of Correa's testimony.  At the ALJ hearing, Correa's counsel asked her whether she had suffered any damage to her body from a seizure, including "banging" her head.  (Tr. 49).  Correa simply responded: "I've definitely hit my head a couple times, black eyes.  And then since the seizures of last year, especially the June ones, I have suffered pretty severe short and long term memory loss."  (Tr. 49).  Correa went on to discuss her worsening memory loss but never again mentioned or discussed hitting her head, black eyes, or head injuries in any way.  *See* (Tr. 49-55).

There are several problems with the ALJ's characterization of Correa's allegations.  Take Correa's testimony.  Nowhere did she ascribe her memory loss to head injuries suffered as a result of her seizures.  She only stated that at some point she had hit her head and developed a black eye during a fall from a seizure.  (Tr. 49).  A review of the record does not reveal any instance when she informed a doctor or any other medical professional that she believed her memory loss was caused by head injuries.  Instead, the record demonstrates that Correa stated that her memory loss and symptoms were caused by the prolonged episode of seizures she suffered after a tonsillectomy in June 2021 and in November 2021.  *See* (Tr. 233, 238, 240, 272, 278, 673-79, 686-689).

Next, Correa's statement was not inconsistent with the record.  She stated that she had previously hit her head and suffered a black eye from falling during a seizure.  But she did not say when this occurred, and the record reflects that she suffered from primary generalized epilepsy since she was eight years old (approximately 2008).  (Tr. 403).  The ALJ was correct that there is no medical evidence in the record demonstrating that Correa suffered head trauma/injury and black eyes related to her seizures.  But this did not necessarily demonstrate that Correa's subjective complaints were inconsistent, because the medical evidence on the record goes back to 2019 and does not provide evidence for any seizure events preceding that

year.  *See generally* (Tr. 279-703).  The reasoning expressly provided by the ALJ for discounting Correa's subjective complaints contained logical gaps.  Furthermore, even if the ALJ's reasoning were not flawed, the ALJ gave no explanation for the basis upon which she found the record to be inconsistent with Correa's claimed limitations in her short-term memory and the need for extensive supervision.  (Tr. 24-25).

Thus, I find that the ALJ failed to apply proper legal standards when she failed to articulate logically coherent reasons for rejecting Correa's subjective symptom complaints regarding the severity and extent of her memory impairment.  42 U.S.C. § 405(g); *Blakley*, 581 F.3d at 405.  The regulations require the ALJ to explain "which of an individual's symptoms [the ALJ] found consistent or inconsistent with the evidence . . . and how [the ALJ's] evaluation of the individual's symptoms led to [her] conclusions."  SSR 16-3p, 2016 SSR LEXIS 4, at *21.  The ALJ did not comply with that requirement, and she failed to build an accurate and logical bridge between the evidence and her conclusion.  *Fleischer*, 774 F. Supp.2d at 877.  As discussed above, this error was not harmless because Correa's alleged limitations could be work preclusive.

## VI.  Conclusion and Recommendation

Because the ALJ failed to apply proper legal standards in discounting Correa's subjective symptom complaints and in determining the RFC, I recommend that the Commissioner's final decision denying Correa's application for DIB be vacated and that Correa's case be remanded for further consideration.

Dated: December 14, 2023

Thomas M. Parker
United States Magistrate Judge

_____

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).